**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **A.S. by and through his next friend** | § | |
| **and mother, ANGELA GERMAINE** | § | |
| **SPENCER,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.:2:20-cv-37** |
| | § | |
| **THE COUNTY OF HARRISON,** | § | |
| **TEXAS,** | § | |
| **Defendant.** | § | |

**FIRST ORIGINAL COMPLAINT**

**NOW COMES** A.S. by and through his next friend and mother, Angela Germaine Spencer, (collectively termed "Plaintiffs" or "A.S." herein) and files this their *First Original Complaint* alleging that the County of Harrison in Marshall, Texas (hereinafter referred to as "the County") by and through their Juvenile Justice Department or the Willoughby Juvenile Center ("the Juvenile Department) otherwise termed "Defendant" herein, violated the various rights of A.S. as more specifically pled herein. A.S. reserves the right to re-plead this *Complaint* if new claims and issues arise upon further development of the facts, as permitted by law.  In support thereof, A.S. would respectfully show this tribunal the following:

**I. BRIEF INTRODUCTION TO THE CASE**

1.      In the educational world, it's called the *Schoolhouse to Jailhouse Pipeline*. It is the unspoken

   conspiracy among school district officials to move a child they do not like, or find

   bothersome, out of the classroom and into a prison cell. The practice is simple, time-tested

   and true. A staff member purposefully provokes a child, gets the child to react and better yet,

   overreact, and then when the child requires some type of physical intervention, the inevitable

happens. In trying to protect themselves from assault, the child touches, pushes or even hits the teacher. Once that happens, the plan is fulfilled and the student is charged with assault on a public servant, a felony. The police are called, the child arrested, brought to juvenile detention center and charged. If the District is really lucky, so they think, the offense is sufficiently severe or reoccurring, that the child is removed from the school permanently. That is exactly what happened to A.S. then barely ten years old who was handcuffed with his hands behind his back and put in a police car and brought to the Harrison County Juvenile Detention Center.

2.    This "Schoolhouse to Jailhouse" conspiracy is particularly troublesome because it disproportionately affects African-American children and children with emotional disabilities. A.S. is both. More importantly, and germane to this case, the jailhouse that A.S. was brought to wasn't equipped to deal with his unique and individualized needs. Again, he was barely ten years old at the time. Frankly he never should have been brought there in the first instance, but he was. Even so, he should he should have been processed and sent home. He was not. In fact he never saw a Magistrate or was given notice of his rights. In addition, he should have seen a physician or medical professional to assess his medical needs. That never happened though he did get a cavity search. He should have seen a psychiatrist or medical professional to assess his mental health and psycho-pharmacological needs but that didn't happen either. While he was at the Detention Center A.S. was never provided the medication that was prescribed for him by his psychiatrist. When it was finally time to go to Court three days later, he was wearing a blue-jump suit, sandals that were way to big, both his hands and feet were cuffed, and all shackled together, frankly akin to a little run-a-way slave. At the Courthouse he walked through the same area as adult criminals. The

Judge admonished mother, telling her to be sure to give A.S. his medications and let him go home.

3.    Bases upon this attack upon his civil rights and dignity A.S. brings forth this complaint based upon violation of his rights pursuant to the United States Constitution as to 4th Amendment to free from excessive and unnecessary seizure and force; the 8th Amendment to be free from cruel and unusual punishment; the Due Process Clause of the 14th Amendment for failure to have been correctly Magistrated, appointed an attorney, for not receiving necessary medical and mental health care and the Equal Protection Clause of the 14th Amendment as to any and all of the above. All these claims are brought pursuant to 42 U.S.C. §1983. In addition, A.S. has statutory claims pursuant to *Section 504 of the Rehabilitation Act of 1973*, 29 U.S.C. §794 ("Rehab Act" or "Section 504") and the *Americans with Disabilities Act* ("ADA"), 42 U.S.C., §12101, et seq. for claims related to discrimination based upon disability. In addition, he also pursues claims related to discrimination based upon race, pursuant to Title VI of the Civil Rights Acts of 1964 codified at 42 U.S.C. §2000d et seq.

## II. JURISDICTION

4.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the United States Constitution and laws of the United States.

## III. VENUE

5.    Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs claims occurred in the Eastern District of Texas, Marshall Division.

## IV. <u>PARTIES</u>

6.    A.S. lives in Texas and at all times pertinent to this case he lived within the Marshall County, Texas with his mother Angela Germaine Spencer ("Ms. Spencer"). They currently live in Tyler, Texas.

7.    The Willoughby Juvenile Center may be found at 1401 Warren Drive, Marshall, Texas 75672.  It is a division within the Calhoun County Government and is the local agency responsible for oversight, rule making, compliance with state and federal law, and control of the provision of juvenile services for the County. They may be served by and through the County Attorney, the Honorable Chad Simms, Calhoun County Courthouse, #1 Peter Whitestone Square, Room 414, Marshall, Texas 75760, (903) 935-8401 [Telephone], (903) 935-4853 [Facsimile] or any other person duely delegated to accept or waive service, or both.

## V. <u>STATEMENT OF FACTS</u>

A.    ABOUT A.S.

8.    A.S. was born on December 15, 2006. He is currently 13 years old.  He has seen a psychiatrist and is prescribed medication for having Attention-Deficit Hyperactivity Disorder.

9.    A.S. is now in the seventh grade. He previously attended Travis Elementary School in the Marshall Independent School District. Currently, he attends Owens Elementary School in the Tyler Independent School District.

10.    A.S. is very active in community sports, like football and basketball. In fact, he plays with the AAU basketball program. He also participates in a traveling team. He also plays organized football and recently won most valuable defensive player of the year.

11.    He also does acting and modeling with Casting360, a company that seeks to connect available talent and talent scouts in various parts of the country, including Dallas, Texas where A.S. participates.

12.    At church, A.S. performs in mimes and participates in other youth activities, including church camping trips.

13.    Outside of school, A.S. thrives as an independent person. He never has a problem requiring significant intervention by an adult, let alone the need for physical restraint, as frequently occurred at school.

B.    ABOUT THE MARSHALL INDEPENDENT SCHOOL DISTRICT

14.    Marshall Independent School District serves about 5, 500 students in Marshall, Texas. The School District was founded in 1898.

15.    According to the MISD website, their Mission is "to improve outcomes for all students by providing leadership, guidance and support to school."[1]

16.    Additionally, "Marshall Independent School District envisions that each learner is equipped to successfully achieve his or her vision and be a productive, contributing citizen in a global society."

17.    According to the District's website, the ethnic demographic makeup of the Marshall ISD is approximately just above 37% African American, 36% Hispanic, 23% Caucasian, and 1% Asian – with 3% of all students identifying as two or more races.

18.    The ethnic demographic makeup Hopewell Middle School is approximately just above 39% Caucasian, 20% Hispanic, 1% Asian, and 36% African-American – with 4% of all students

---

[1].  http://www.marshallisd.com/marshall_independent_school_district/about_misd

identifying as two or more races. Per the District's website, almost 70% of the students who attend the school are economically disadvantaged.[2]

19.     For the 2016- 2017 School Year the Marshall ISD[3] reported to the Texas Education Agency ("TEA") that they had approximately 5,894 students, of which there had been 161 students removed to a *Disciplinary Alternative Education Placement* ("DAEP"), Ninety (90) students had mandatory removals and ninety (90) students had discretionary DAEP removals.

20.     In further breakdown by race, there were 1,265 White students, which was 23.26 percent of the total number of students in Marshall ISD. In comparison, there were 2,015 Black students, which was 37.05 percent of the total number of students in Marshall ISD.

21.     When looking at the racial breakdown of the total number of DAEP actions, 35 actions were taken against White students and 110 actions were taken against Black students. Thus, 2.76 percent of White students had DAEP actions taken against them while 5.46 percent of Black students has DAEP actions taken against them.

22.     Additionally, when looking at the breakdown of special education students placed in DAEP, 43 special education students were placed in DAEP, while 157 non-special education students were placed in DAEP.

23.     Finally, when looking at the number of DAEP actions taken against economically disadvantaged students, actions were taken against 286 economically disadvantaged students compared to DAEP actions taken against 28 economically disadvantaged students.

24.     When analyzing the total number discipline actions taken in Marshall ISD in the 2016-2017

---

[2].  A student is defined as "economically disadvantaged" if he or she is eligible for free or reduced-price lunch or other public assistance. /cgi/sas/broker

[3].  https://rptsvr1.tea.texas.gov/cgi/sas/broker

school year compared to the racial makeup of the actions, Black students were disproportionately reprimanded at a higher rate than their White peers, as were children with disabilities.

25.     Upon reason and belief Plaintiffs allege that disproportionately more African-American children are placed in the local Juvenile Detention Center than children who identify as Caucasian.

C.      THE USE OF SCHOOL RESOURCE OFFICERS ("SRO's)

26.     The School Resource Officer program in the United States is over sixty years old, but the program did not gain prominence until the 1990s in response to various school shootings.

27.     According to national data, SRO's can be found in approximately 35 percent of schools across America. They can be found at each school level (elementary, middle, and high schools), and they can be found in both suburban and metropolitan areas. Further, they are found in the schools regardless of enrollment size. In fact, most are embedded within a school to assist school administration with anything that would involve a criminal law component, such as the presence of a firearm on campus.

28.     At many schools, an SRO's role is clearly defined and the officer only engages students as part of a community policing project; they do not interfere or have any role with administrative discipline.

29.     However, in other schools, SRO's are expected to directly assist with student discipline.

D.      LAWFUL USE OF RESTRAINTS AND ARRESTS

30.     At public schools in Texas, federal law clearly lays out the framework for lawful restraints and arrests. The Texas Education Code states that "it is the policy of the state to treat with dignity and respect all students, in regard to the use of restraints. *See* Chapter 29, Subchapter

A.

31.    Per Marshall ISD's own policies and procedures a "restraint" means the use of physical force
or a mechanical device to significantly restrict the free movement of all or a portion of the
student's body.  It may only be used in an emergency which is a situation in where a student's
behavior poses a threat of imminent, serious physical harm to the student or others; or
imminent, serious property destruction. It must be limited to the use of reasonable force and
be discontinued at the point at which the emergency no longer exists.

32.    Importantly, school employees must be trained in the use of restraint. If any personnel are
called upon to use a restraint *in an emergency* and is not trained, they must receive training
within 30 school days following the use of the restraint. Training should include prevention
and de-escalation techniques. In short, the restraint should be a last resort, not the first
option. Restraints must be documented, that is a written documentation, and parents must
be notified when a restraint is used against their child.

E.    COMPLAINT HISTORY- THE 2015-2016 SCHOOL YEAR

33.    During the 2015-2016 school year, A.S. and his mother were homeless. In October 2015,
they applied for the District's assistance under the McKinney-Vento Homeless Assistance
Act, 42 U.S.C. §11301 *et seq.*

34.    On the application, Ms. Spencer indicated that she and A.S. were living with a friend. Ms.
Spencer was aware of the criminal liability for falsifying information, and willingly signed
the required document to enroll A.S. in the Marshall Independent School District.

35.    Once a person signs the McKinney-Vento application, the School District is required to take
it at face value. In fact, under this Act it is illegal for a School District to stalk the homeless,
or retaliate against them for using the Act or act in anyway to thwart the student's admission.

Nevertheless, staff from the School District did all three.

36.    Over the course of the ensuing period, District staff would follow Ms. Spencer to and from work, her father's home and her residence, all with the intent to harass and interview neighbors to undermine her representation she was homeless.

37.    Krystal Moody, director of Human Resources at Wiley College, Ms. Spencer's place of employment, even wrote a letter to the District confirming that Ms. Spencer indeed lived in Marshall, Texas.

38.    Nevertheless, in a letter dated February 25, 2016, David Segers, the District's Truancy Facilitator, informed Ms. Spencer that MISD believed they had enough evidence to remove A.S. from the MISD.

39.    Ms. Spencer appealed and filled out another application indicating an address in the District where she and A.S. temporarily lived.

40.    The School District again threatened to remove A.S. from the MISD.

41.    Ms. Spencer then filed a complaint with the federal government alleging that the School District failed to follow the requisites of the *McKinney-Vento Homeless Assistance Act* ("The Act"), 42 U.S.C. §11301 *et seq.* After filing that complaint, the retaliation against A.S. slowly began.

42.    During the Spring of 2016, A.S. continued to receive special education services for his emotional condition and behavioral issues. A.S.'s mother learned that A.S. was being restrained often multiple times throughout the day, and often day after day.

43.    Ms. Lewis sought and received legal services to address their concerns. Specifically, she was concerned about the District's violation of A.S.'s rights pursuant to the *Individuals with Disabilities Education Act* ("IDEA"), 20 U.S.C. §1401 et seq., and also the McKinney-Vento

Act.

44.  At the end of the spring semester for 2016, in order to address mother's complaints, the parties met in a mediation and settled their concern about the McKinney Vento Act and allegations of violations of IDEA. Through settlement the parties agreed to set up a plan to address A.S.'s needs in his Special Education Program, particularly regarding the use and over-use of restraints.

F.    THE 2016-2017 SCHOOL YEAR: THE INCIDENT AND FOLLOWING RETALIATION

45.  Despite the agreement reached at the end of the Spring 2016 semester, Marshall ISD staff continued to use and overuse restraints on A.S., without following state law. In fact, A.S. was restrained close to 200 times during the 2016-2017 school year.

46.  On or about September 9, 2016, A.S. and a teacher had physical contact. As a result, and not surprisingly, he was placed in *Disciplinary Alternative Education Placement* ("DAEP").

47.  A.S.'s mother filed another complaint, this time with the Texas Education Agency ("TEA"), alleging that A.S.'s rights were being violated by his placement in DAEP. The complaint was ignored.

48.  About a month later, the DAEP Principal Barron, restrained A.S.

49.  That afternoon, A.S. came home from school with bruises under his eye and marks on his neck. He told his mother they occurred when he was restrained by Mr. Barron.

50.  A.S. told his mother that in addition to restraints, Principal Barron blew in his face, taunted him, and laughed in his face. Ms. Spencer complained to Mrs. Fessler, the Principal of Travis Elementary School but she did not respond or attempt to address these concerns either.

51.  A.S. also told his mother that Principal Barron put his knee into A.S.'s stomach during a

restraint. Mr. Barron is well over 6 feet and 300 pounds. At the time, A.S. was 9 years old, about 4 feet 3 inches tall and weighed between 65-70 pounds. His mother complained to Mrs. Fessler about these issues as well. Fessler did not respond to or address these concerns, either.

52.    In fact, A.S. was being restrained everyday at DAEP.  Additionally, DAEP staff would often call A.S.'s mother to take him out of school when they refused to take care of him.

53.    While A.S. was being restrained and also when he was taken out of school, he did not receive educational services. Ms. Spencer complained to both Mrs. Fessler and Ms. Perkins, but they did not respond to these complaints either.

54.    On December 15, 2016, A.S. turned 10 years old.

55.    About a month later, A.S. began having problems with the DAEP teacher, Mr. Gray.

56.    One day, Mr. Gray performed a full body hold restraint on A.S.. During this restraint, A.S. became bloody and was sent home.

57.    When he got home, A.S. told his mother that Mr. Gray *always* lays on him when restraining him. His mother complained to Mrs. Fessler. She did not respond to this complaint either.

58.    On or about January 15, 2017, Principal Fessler received an email noting that DAEP staff were repeatedly making comments stating that A.S. will be in "Kids Jail" by his birthday[4]. This reflects the mind set of staff more intent on steering A.S. into the criminal justice system, rather than away from it, as any good teacher should.  A.S. was now very purposefully well into the "schoolhouse to jailhouse pipeline."

59.    When A.S.'s mother complained to Principal Fessler, Mrs. Fessler indicated that there would

---

[4].  Plaintiffs reasonably believe that staff knew that in Texas, a child cannot be held responsible for criminal activities until they are 10 years old.  Texas Family Code _____ .

be an investigation into the mentioned above. However, Ms. Spencer never received any results from the alleged investigation and believes there never was one.

60.    Unfettered, DAEP's staff continued to overuse  restraints. At the end of the month, Ms. Spencer received another notice that A.S. was restrained.

61.    At the beginning of the next month, Ms. Spencer let the District know that A.S. was being represented by counsel to help investigate her complaints about the overuse of restraints.

62.    Additionally, A.S.'s mother filed another complaint with School District Officials about the comments that staff were steering her son to the juvenile system, but she never received a response.

63.    As A.S. was being manhandled by staff on almost a daily basis, his classmates soon became equally emboldened and started bullying him also. Ms. Spencer complained to Mrs. Fessler, about the bullying, but she did not respond to this complaint either.

64.    At the end of March, the TEA completed their investigation into A.S.'s placement in DAEP. They found that MISD did not afford A.S. all of his procedural rights when they placed him in DAEP. Further, the District did not ensure that all the staff restraining A.S. were trained in the use of restraint in accordance with Texas regulatory law.

65.    Not surprisingly, this report led to even more retaliation from Marshall ISD. Someone reported Ms. Spencer to Child Protective Services ("CPS") alleging that she neglected her son's medical needs. Ms. Spencer was able to show CPS the complaints were unfounded. She was told the complaint came from a staff member at the Defendant School District, more retaliation.

66.    After the TEA report was released, A.S. experienced even more bullying from his peers. On one occasion, he was kicked by another student in his self-contained classroom, and the staff

did nothing to prevent the incident.

67.    Another time a student threw glass at him. Staff did nothing to prevent this incident either.

68.    Ms. Spencer was not informed of this bullying, nor was there any explanation given to the numerous injuries A.S. came home with. Mrs. Spencer complained that A.S. was not being kept safe, which was a common pattern, District staff failed to investigate her concerns.

69.    During the first week of May 2017, A.S. was again bullied and harassed by a classmate. When A.S. told his mother what happened, he begged her not to tell anyone at the School District because he was afraid that "things will get worse" for him.

70.    A few days later, Ms. Spencer sent an email to Ms. Perkins about the bullying and harassment. She received no response.

71.    While the bullying persisted, A.S. also continued to be restrained by staff on almost a daily basis. On May 10, he was restrained for more than an hour, in violation of state law.

72.    The School District's reports and records reflect that each time A.S. was restrained, the restraint, on average, lasted thirty minutes to an hour. Sometimes he was restrained even longer, and on multiple occasions, he was restrained multiple times a day, all in violation of state law.

73.    Ms. Spencer retained an Educational Advocate during this period on A.S.'s behalf. On May 10th, the advocate went to the School to check upon A.S.'s welfare.

74.    After the Advocate left, District staff retaliated.

75.    While A.S. was in class, he started throwing a pencil. He was not throwing the pencil at anybody and the pencil did not hit anybody.

76.    Nevertheless, and even though there was no imminent threat of injury to anyone or property, Mr. Gray provided the usual and customary intervention for A.S., and restrained him with

a full body restraint.

77.   A.S. was on his back, and tried to free himself from Gray, but he could not as Gray was significantly heavier than A.S. and his weight was hurting him.

78.   A.S. tried to get released from Gray more and more teachers came into the room to also hold A.S. down.

79.   In his efforts to free himself, A.S. apparently hit Mr. Gray.

80.   At this point, staff found their excuse to rid themselves of A.S. and his mother, he had hit a staff member, considered an *Assault On A Public Servant*, a felony.  A staff member  in the classroom pounced on the opportunity and unnecessarily called the SRO to have A.S. arrested.

G.    A.S IS INCARCERATED

81.   When the SRO came into the room, A.S. was handcuffed, putting his hands behind his back.

82.   There were two SRO's, who carried A.S. to their police car.

83.   A.S. cried out "let me go", but one SRO replied back, mockingly, "no".

84.   The SRO put A.S. in the backseat of the police car.

85.   They did not place him in a seatbelt, leaving A.S. free to bang around in the back, while he driven to the Juvenile Detention Center.  It was a Wednesday.

86.   Upon entry he did not see a Magistrate.

87.   He was never read his rights.

88.   He was never provided an attorney.

89.   He never saw a physician or medical professional to assess his medical needs.

90.   A.S. did receive a cavity search.

91.   He never saw a psychiatrist or medical professional to assess his mental health and psycho-

pharmacological needs.

92.    He never saw a teacher.

93.    He never saw a Counselor.

94.    A.S. was never provided the medication that was prescribed for him by his psychiatrist.

95.    He stayed at the facility until Friday. When it was finally time to go to Court three days

later, he was wearing a blue-jump suit, sandals that were way to big, both his hands and feet

were cuffed, and all shackled together, akin to a little run-a-way slave.

96.    At the Courthouse he walked through the same area as adult criminals.

97.    The Judge admonished mother, telling her to be sure to give A.S. his medications and let him

go home.

98.    A.S. was sent to the Juvenile Detention Center on felony charges of Assault on a Public

Servant. At that time he 10 years old, and was in the same center where teenagers up to 17

years old are held. He was kept in detention for a couple of days with these young men.

99.    At the hearing the Judge admonished mother, making sure she have continued to give A.S.

his prescribed medications.

100.   Soon after, the County Attorney sent Ms. Spencer a letter to inform her that School District

officials would drop the charges if A.S. was removed from the Marshall ISD. Ms. Spencer

agreed to those terms and A.S. transferred from Marshall ISD to Tyler ISD.

101.   The retaliation had worked, A.S. and his mother were gone.

G.    THE 2017-2018 SCHOOL YEAR

102.   During the 2017-2018 school year, A.S. was transferred to the Tyler Independent School

District.

103.   At Tyler ISD, administrators, teachers and staff had to work hard with A.S. to undo bad

behaviors he brought from Marshall ISD, and they helped him build up self-esteem and trust.

104.    The hard work paid off. In addition to his community activities, A.S.'s academic achievements at Tyler ISD far exceed his experience at Marshall ISD. His grades are all passing, and for several six weeks he made the A and B honor roll. He also did well on the reading and math STAAR test.

105.    A.S.'s successes at Tyler ISD show that he can thrive in a school environment just like he thrives in non-educational settings. The failures and omissions of Marshall ISD prevented A.S from thriving like he is clearly able to.    His placement in the Juvenile Detention was unnecessary.

106.    He never should have been taken there.

107.    He never should have been admitted.

108.    Even if admitted, if had been seen by any licensed professional, psychiatrist, physician, physician's assistant or aide, nurse, social worker or teacher upon intake or in a timely manner, he would have discharged home, because it was obvious he never should have been there, and they could not meet his needs.

109.    For these reasons, Plaintiffs make the following claims against Harrison County Juvenile Justice Department.

## VI.  STATE ACTION

110.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each following paragraph and section, incorporates by reference as if fully set forth herein, the one above it.

111.    The County Defendant was at all times and in all matters acting under color of state law when they permitted A.S. to be subjected to the wrongs and injuries set forth herein.

## VII.   UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS

112.   Plaintiffs incorporate by reference al the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

113.   Plaintiffs contend that the County Defendant had a policy, procedure, practice and custom to not provide appropriate medical and mental health care to minors, nor have them seen by a Magistrate in a timely manner, and incarcerating children of a tender age unnecessarily, and as such violated A.S.'s rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

114.   These policies and procedures were based upon well-developed and settled federal caselaw, federal rules, directives from federal executive agencies like the *Office of Civil Rights* with the United States Department of Education, directives from the National and Texas Association of School Boards, Texas Law, Texas Rules and Ethical Standards for correctional professionals.

115.   Plaintiffs contend that the County Defendant failed to sufficiently train staff in addressing the needs of A.S., a person with a disability, thereby violating his rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which A.S. seeks recovery pursuant to 42 U.S.C. §1983.

116.   Plaintiffs contend that Defendants failed to sufficiently supervise staff in addressing the needs of a person with a disability, like A.S., thereby violating his rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which A.S. seeks recovery pursuant to 42 U.S.C. §1983.

117.   During the relevant time period contemplated by this cause of action, the County of Harrison, had an actual policy, practice and custom of conscious and deliberate indifference

to federal law, federal and state administrative directives, and Juvenile Justice Board policies and procedures in regard to the treatment of A.S., and such failures were a moving force in the injuries to A.S. for which A.S. seeks recovery pursuant to 42 U.S.C. §1983.

### VIII. CONSTITUTIONAL CLAIMS

A.    VIOLATIONS OF THE FOURTH AMENDMENT

118.    Plaintiffs contend that the acts and omissions of this Defendant violated the rights of A.S. pursuant to the Fourth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

119.    The restraint and shackling of A.S. and force used against him by Defendant was unreasonable.

120.    The restraint and shackling of A.S. and force used against him by Defendant was unnecessary.

121.    Th restraint and shackling of A.S. and force used against him by Defendant was excessive.

122.    As such, all these acts by Defendant violated the rights of A.S, pursuant to the Fourth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

B.    VIOLATIONS OF THE FOURTH AMENDMENT

123.    Plaintiffs contend that the acts and omissions of this Defendant violated the rights of A.S. pursuant to the Eighth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

124.    The incarceration of A.S. was cruel and unusual.

125.    The shackling of A.S. like a run-away slave was cruel and unusual.

126.    Placing A.S. who was ten years old at the time with young men was cruel and unusual.

127.    Not providing A.S. necessary medical and mental health care was cruel and unusual.

128.    As such, all these acts and omissions by Defendant violated the rights of A.S. pursuant to the Eight Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

C.    EQUAL PROTECTION CLAUSE OF THE 14th AMENDMENT

129.    The acts and omissions of the Defendant singularly discriminated against A.S. when treating him in a disparate manner based upon race as compared to other Caucasian students similarly situated, thereby violating his rights pursuant to the *Equal Protection Clause* of the Fourteenth Amendment, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983 and 1988.

130.    The acts and omissions of Defendant singularly discriminated against A.S. when treating him in a disparate manner based upon his disabilities, as compared to his non-disabled peers, thereby violating his rights pursuant to the *Equal Protection Clause* of the Fourteenth Amendment, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983 and 1988.

D.    DUE PROCESS CLAUSE OF THE 14th AMENDMENT

131.    A.S. has a constitutional right, pursuant to the Due Prices Clause of the 14th Amendment to the United States Constitution, to be free from physical abuse, unnecessary and excessive restraint and shacking by Defendant.

132.    Moreover, A.S. never saw a Magistrate, never had his rights read to him nor was given an attorney violating his rights under the 14th Amendment.

133.    As such he seeks recovery pursuant to 43 U.S.C. §1983.

## IX. **CLAIMS PURSUANT TO THE REHABILITATION ACT**

134.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and

effect as if herein set forth.

135.    A.S. is "an individual with a disability" pursuant to Section 504 and its implementing
regulations and directives.

136.    The County of Harrison receives federal funds and thus follows the requisites of Section 504
of the Rehabilitation Act of 1973, 29 U.S.C. §794.

137.    The implemented regulations of Section 504 require that each state that receives
disbursements, including the state's political subdivisions such as its Juvenile Justice
Division, must ensure that all juvenile with a disability within its control, be given
appropriate and necessary accommodations, pursuant to federal law and rules. To the degree
that a policy or practice hinders honest consideration of a disabled student's unique and
individualized needs, and fails to accommodate that child's disability and keep them safe,
it violates Section 504.

138.    Plaintiffs further assert that because the Defendant failed to provide A.S. a safe and non-
hostile alternative environment to a Detention Center, such failures as noted above, have
together and separately, contributed to violating his rights pursuant to Section 504, and the
federal rules and regulations promulgated pursuant thereto.

139.    In addition and in the alternative, the failures denoted herein by the School District to
provide him a psychiatric assessment or access to his psychotropic medications equally
caused A.S. to be a victim of intentional discrimination based upon disability by the School
District.

140.    A.S. was also a victim of disparate impact under Section 504, by the acts and omissions by
the Defendant.

141.    Lastly, the acts and omissions of the Defendant violated the regulations promulgated under

Section 504 and as such create a private cause of action for its violations thereby.

142.    Such failures proximately caused injury to A.S.

## X. CLAIMS PURSUANT TO THE AMERICANS WITH DISABILITIES ACT

143.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

144.    In addition and in the alternative to the above, the facts as previously described demonstrate violations of the *Americans with Disabilities Act*, 42 U.S.C. §12131, et seq ("ADA").

145.    A.S. is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2).

146.    The Harrison County Juvenile Justice Program and Detention Center, is a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

147.    The Defendant and its programs and facilities and their operation constitutes a program and services for ADA purposes.

148.    Specifically, and separate and apart from his Section 504 cause of action, A.S. alleges that the Defendant failed and refused to reasonably accommodate and modify services as to him, in violation of Title II of the ADA.

149.    Such failures proximately caused injuries to A.S.

## XI. TITLE VI CLAIMS

150.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

151.    Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000d et seq, and its implementing regulations, require that each state that receives disbursements, including the state's political subdivisions, not permit a student to be a victim of discrimination based

upon race or racial stereotypes.

152. Plaintiffs assert that Defendant because the District knew that A.S. was African-American it had a duty to prevent a ten-year old child who had in fact, broken no law, from being another statistic, and such failures as noted herein, have together and separated, contributed to violating his civil rights pursuant to Title VI. Specifically, African American children are more likely to be incarcerated and placed in a disciplinary detention setting than Caucasian children by the Defendant.

## XII. RATIFICATION AND RESPONDEAT SUPERIOR

153. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

154. The Defendant ratified the acts, omissions and customs of all its administrators, personnel and staff.

155. As a result, the Defendant is responsible for the acts and omissions of all administrators, personnel and staff.

## XIII. PROXIMATE CAUSE

156. Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

157. Each and every, all and singular of the foregoing acts and omissions, on the part of the Defendant, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIV. DAMAGES

158. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

159.    As a direct and proximate result of the Defendant's conduct, A.S. has suffered injuries and damages, for which he is entitled to recover herein including but not limited to:

a.    Physical pain in the past;

b.    Physical pain in the future;

c.    Loss of educational opportunities in the past;

d.    Loss of educational opportunities in the future;

e.    Medical expenses in the past;

f.    Medical expenses in the future;

g.    Mental anguish in the past;

h.    Mental anguish in the future;

i.    Mental health expenses in the past;

j.    Mental health expenses in the future;

k.    Stigma in the past;

l.    Stigma in the future;

m.    Physical impairment in the past; and

n.    Various out-of-pocket expenses incurred by his family but for the acts and omissions of the School District.

## XV. <u>ATTORNEYS FEES</u>

160.    Plaintiffs incorporate by reference all of the above related paragraphs, as if fully set forth herein.

161.    It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to Section 504, the ADA, Title VI, 42 U.S.C. §1983, and 42 U.S.C. §2000d et seq.

## XVI. DEMAND FOR A JURY TRIAL

162.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## XVII. PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray in the manner and particulars noted above, and that Defendant be required to fully compensate by an amount sufficient to fully compensate him for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Section 504, the ADA, Title VI, §1983, and 42 U.S.C. §2000d et seq., together with pre- and post-judgment interest, and court costs expended herein and for such other further relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,

*/s/ Martin J. Cirkiel*
Martin J. Cirkiel, Esq.
State Bar No. 00783829
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

Anthony O'Hanlon, Esq.
Attorney & Counselor At Law
State Bar No. 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]
aohanlon@somlaw.net [Email]

**ATTORNEY FOR PLAINTIFFS**